IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| KERRISUE BARTHOL, o/b/o ) | |
| R.L.B. ) | |
|             ) | |
|         Plaintiff, ) | |
|             ) | |
| v.         ) | CIVIL ACTION NO.  1:08cv39-CSC |
|             ) | (WO) |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF ) | |
| SOCIAL SECURITY, ) | |
|             ) | |
|         Defendant. ) | |

**MEMORANDUM OPINION and ORDER**

The plaintiff, Kerrisue Barthol, filed this lawsuit on behalf of her minor child, R.L.B., challenging a final judgment by Defendant Michael J. Astrue, Commissioner of Social Security, in which he determined that R.L.B. is not "disabled" and, therefore, not entitled to child supplemental security income benefits.  In 2004, the plaintiff filed on behalf of R.L.B. an application for supplemental security income benefits.  The plaintiff's application was denied at the initial administrative level.  The plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ").  Following the hearing, the ALJ determined that R.L.B. was not disabled. The Appeals Council rejected a subsequent request for review. The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[1]  *See  Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).   The

---

[1] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

parties have consented to the undersigned United States Magistrate Judge rendering a final judgment in this lawsuit.  The court has jurisdiction over this lawsuit under 42 U.S.C. §§ 405(g) and 1383(c)(3).[2]  Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be reversed and this case remanded to the Commissioner for further proceedings.

## I.  STANDARD OF REVIEW

In 1996, the President signed into law the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, which included a new standard for defining child disability under the Social Security Act.  *See* Pub. L. No. 104-193, 110 Stat. 2105, 2188 (1996).  The revised statute provides that an individual under 18 shall be considered disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(I) (1999).  The sequential analysis for determining whether a child claimant is disabled is as follows:

1. If the claimant is engaged in substantial gainful activity, he is not disabled.

2. If the claimant is not engaged in substantial gainful activity, the Commissioner determines whether the claimant has a physical or mental impairment which, whether individually or in combination with one or more other impairments, is a severe impairment.  If the claimant's impairment is not severe, he is not disabled.

---

[2] Title 42 U.S.C. §§ 405(g) and 1383(c)(3) allow a plaintiff to appeal a final decision of the Commissioner to the district court in the district in which the plaintiff resides.

      3.      If the impairment is severe, the Commissioner determines whether the impairment meets the durational requirement and meets, medically equals, or functionally equals in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies this requirement, the claimant is presumed disabled.

*See* 20 C.F.R. § 416.924(a)-(d) (1997).

The Commissioner's regulations provide that if a child's impairment or impairments are not medically equal, or functionally equivalent in severity to a listed impairment, the child is not disabled. *See* 20 C.F.R. § 416.924(d)(2) (1997). In reviewing the Commissioner's decision, the court asks only whether her findings concerning the steps are supported by substantial evidence. *See Brown v. Callahan*, 120 F.3d 1133 (10th Cir. 1997).

## II.  ADMINISTRATIVE PROCEEDINGS

R.L.B. was 14 years old at the time of the June 14, 2006, hearing before the ALJ. (R. 433.) At that time, he was repeating the ninth grade. (R. 435.) The plaintiff alleges that, on October 1, 2002, R.L.B. became disabled due to a reading disability, narcolepsy, attention deficit hyperactivity disorder, bipolar depression, scoliosis, and obsessive compulsive disorder. (R. 436.) Following the administrative hearing, the ALJ found that R.L.B. has severe impairments of attention deficit disorder and a reading disorder. (R. 17.) The ALJ concluded that R.L.B.'s impairments, when considered singularly or in combination, did not meet or medically equal in severity the criteria for any impairment listed at 20 CFR, part 404, Subpart P, Appendix 1. (R. 19.) Accordingly, the ALJ determined that R.L.B. was not disabled. (R. 24.)

## III.  The Issues

The plaintiff raises the following issues:

(1) Whether the ALJ erred in failing to properly apply the Brady standard when determining the severity of R.L.B.'s obsessive compulsive disorder.

(2) Whether the ALJ erred in finding that R.L.B. does not functionally equal the listings.

(3) Whether the ALJ erred in failing to properly consider R.L.B.'s mother's testimony.

(4) Whether the ALJ erred in failing to properly accord weight to Dr. Handal's opinion.

(Doc. No. 1.)

### III. DISCUSSION

The plaintiff raises several issues and arguments related to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence. *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987). However, the court pretermits discussion of the plaintiff's specific arguments because the court concludes that the Commissioner erred as a matter of law, and thus, this case is due to be remanded for further proceedings. Specifically, the court finds that the Commissioner failed to properly consider R.L.B.'s obsessive compulsive disorder as a severe impairment and failed to properly discount Dr. Handal's opinion that R.L.B. suffers from marked limitations in the domains of attending and completing tasks and interacting and relating with others.

### A. Obsessive Compulsive Disorder

When deciding whether R.L.B.'s obsessive compulsive disorder was a non-severe impairment at step two of the sequential evaluation, the ALJ determined that "the record includes numerous mental and/or emotional diagnoses, but the most supported diagnoses are attention deficit disorder and a reading disorder." (R. 17.) The court, however, is unable to determine whether the ALJ's omission of R.L.B.'s obsessive compulsive disorder as a severe impairment is supported by substantial evidence. The Commissioner argues that the ALJ's failure to find R.L.B.'s obsessive compulsive disorder as a severe impairment is harmless because the ALJ listed R.L.B.'s "numerous mental or emotional diagnoses, including an attention deficit disorder, an attention deficit hyperactivity disorder, a mood or bipolar disorder, an obsessive compulsive disorder, an overanxious disorder, a conduct disorder, and a reading disorder" and subsequently concluded that "[t]he record ... shows that the claimant was treated on a sporadic basis and that the severe symptoms needed to establish the severity of any impairment listed in Appendix 1 has not been shown in this case." (R. 19.) The evidence belies this characterization.[3]

The severity step is a threshold inquiry which allows only "claims based on the most trivial impairment to be rejected." *McDaniel v. Bowen*, 800 F.2d 1026, 1031 (11th Cir. 1986). Indeed, a severe impairment is one that is more than "a slight abnormality or combination

---

[3] Moreover, the ALJ's additional determination that "[b]ecause the evidence fails to establish that the child's impairments meet(s) or medically equals a listed impairment, [he] must determine whether the child has an impairment (or combination of impairments) that is 'functionally equal' to the listings and satisfies the 12-month duration requirement" without further discussion of R.L.B.'s obsessive compulsive disorder indicates that the ALJ did not consider R.L.B.'s disorder in his analysis. (R. 19.)

of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." *Bowen v. Yuckert*, 482 U.S. 137, 154 n. 12 (1987) (citing with approval Social Security Ruling 85-28 at 37a).

A physical or mental impairment is defined as "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(c). The plaintiff has the "burden of showing [her] impairment is 'severe' within the meaning of the Act." *McDaniel,* 800 F.2d at 1030 - 31 ("Unless a claimant can prove, as early as step two, that she is suffering from a severe impairment, she will be denied disability benefits.")

Although the ALJ did not specifically find that R.L.B.'s obsessive compulsive disorder was a severe impairment, the medical records indicate that R.L.B. was repeatedly diagnosed as suffering from obsessive compulsive disorder and received treatment for this mental condition on a monthly basis since 2005. For example, on June 20, 2005, R.L.B. and his mother went to the office of Dr. Nelson M. Handal, a child psychiatrist, complaining of behavioral problems, inattention, and moodiness. (R. 299.) During this initial doctor's visit, R.L.B. reported that he has the following obsessions and compulsions:

> [He] has difficulty coping with even small changes in schedules, environment, etc., particular about clothing, repeats phrases, songs, etc., which intrude on thoughts or activities, feels everybody is against him . . ., does not listen, avoids others' efforts to explain reasons, will go to extreme lengths to prove others wrong, consequences do not change his . . . behavior,

6

>>twists arguments or situations for own benefit, blames others, threatens others when things don't go his . . . way.

(R. 300.) Dr. Handal concluded that, based on information provided by the patient, his mother, and clinical observation material,[4] R.L.B. meets the criteria for several psychological conditions, including attention deficit disorder and obsessive compulsive disorder. (R. 301-02.) Dr. Handal prescribed medication, including Provigil, Metadate, and Abilify, to treat R.L.B.'s symptoms. (R. 302.) On June 25, 2005, R.L.B. returned to Dr. Handal's office, reporting that his mood had improved and his attention was "a little better." (R. 297.) On July, 14, 2005, Dr. Handal determined that R.L.B.'s condition was "somewhat improved." (R. 294.) During a follow-up visit on July 27, 2005, R.L.B.'s mother reported that R.L.B. "does not get as mad as easy." (R. 292.)

On July 27, 2005, August 3, 2005, and August 12, 2005, Dr. Gabriel Rodriguez, a clinical psychologist, conducted psychological evaluations and testing. (R. 229.) Dr. Rodriguez noted that R.L.B.'s performance on the word reading, math and spelling sub-tests was significantly below the predicted score ranges based on his full-scale I.Q. score. (R. 230.) When discussing the results of the Children's Yale-Brown Obsessive Compulsive Scale, Dr. Rodriguez found as follows:

>>. . . [R.L.B.] only endorsed two items on the Obsessions Checklist; Excessive concern about animals/insects (because he is allergic to bees) and fear of doing something else embarrassing. He did not endorse any items on the

---

[4] The court notes that the clinical observation material in the record was completed by R.L.B.'s mother. (R. 304.)

> Compulsions Checklist. This is considered an underreporting of symptoms and a lack of insight into his behavior. During the testing, [R.L.B.] exhibited various signs of OCD, including taking an inordinate amount of time on the subtests, being preoccupied with his own thoughts, and checking his work for an extended period of time.

(R. 230-31.) In addition, Dr. Rodriguez noted that R.L.B. "does not know when to move on to the next problem." (R. 231.) The clinical psychologist recommended that R.L.B. follow up with Dr. Handal "for medication management and consideration of adding a medication targeting his OCD symptoms." (*Id*.)

On August 24, 2005, R.L.B. went with his mother to Dr. Handal's office. (R. 289.) The psychiatrist's notes indicate that, although R.L.B. stated that "everything is going good," his mother reported that "his OCD symptoms are interfering with his functioning" and that "he gets stuck on ideas and has difficulty transiting." (*Id*.) Dr. Handal recommended that R.L.B. continue individual therapy with Dr. Rodriguez and determined that R.L.B. should continue taking Metadate CD and Abilify and prescribed Zoloft. (R. 291.)

On October 25, 2005, R.L.B. returned with his mother for a therapy session with Dr. Rodriguez. (R. 375.) During the session, R.L.B. indicated that "he gets stuck by thinking about the problem 'a lot.'" (*Id*.) Dr. Rodriguez noted that R.L.B. "has difficulty making a shift to the next problem. He does not know when to stop working on a problem. He tends to be a perfectionist and attempts to control all situations." (R. 375-76.) Dr. Rodriguez "coached [R.L.B.] on test-taking strategies and ways of fighting the OCD." (R. 376.)

On that same day, R.L.B. went to Dr. Handal for an evaluation. (R. 284.) During the

evaluation, R.L.B.'s mother reported that "he is worse because of his smart mouth and attitude" and that his "OCD symptoms are bad because he has to have things his way or no way [and] 'he will not compromise.'" (*Id.*)  She also reported that R.L.B. "punched a hole in the wall yesterday because his sister woke him up to wash the dishes." (*Id.*)  Dr. Handal again diagnosed R.L.B. as suffering from a variety of psychological conditions, including Attention Deficit Disorder, Mood Disorder, and Obsessive Compulsive Disorder. (R. 285.)  Dr. Handal noted that R.L.B. benefitted from his current medication regimen and increased R.L.B.'s prescription of Abilify. (*Id.*)

On November 8, 2005, R.L.B. returned with his mother to Dr. Handal for an evaluation.  During the doctor's visit, R.L.B. stated that "the medicine helps [him] stay calmer and not get as angry." (R. 282.)  Dr. Handal assessed that R.L.B.'s "ADHD and mood are improved but the OCD symptoms are interfering with his functioning 'a lot' per mother." (*Id.*)  The psychiatrist determined that R.L.B. benefitted from his current medication regimen and renewed his prescriptions for Metadate, Abilify, and Zoloft. (R. 280-81.)  One month later on December 8, 2005, R.L.B. returned for an evaluation with Dr. Handal. (R. 280.)  Once again, the psychiatrist assessed that R.L.B.'s "ADHD and mood are improved but the OCD symptoms are interfering with his functioning 'a lot' per mother." (R. 280-81.)

During an evaluation on February 2, 2006, Dr. Handal noted that R.L.B. was attentive, his thought process was logical, and his attention had improved with medication. (R. 336.)  Dr. Handal recommended that R.L.B. continue taking Zoloft for his obsessive compulsive

9

disorder. (R. 336.) On March 20, 2006, R.L.B.'s mother reported to medical personnel that R.L.B. was "doing well with improvement in grades and no behavioral problems." (R. 338.) At that time, R.L.B.'s prescriptions were renewed. (R. 339.)

On August 15, 2006, R.L.B. returned with his mother to Dr. Handal's office. (R. 413.) R.L.B.'s mother stated that R.L.B. "has a bad temper [and] anything can set him off." (*Id.*) R.L.B. indicated that he "can focus somewhat at school," but that he "[does not] feel like anything is working." (*Id.*) Dr. Handal advised that R.L.B. discontinue taking Metadate and prescribed Daytrana to treat his attention deficit hyperactivity disorder. (*Id.*) The child psychiatrist also advised that R.L.B. should continue taking Zoloft for the treatment of his obsessive compulsive disorder. (R. 414.) On August 24, 2006, R.L.B and his mother and sister returned to Dr. Handal's office. R.L.B.'s mother reported that "he still has an anger problem" and that "he acts like he is not supposed to get punished and still punches walls." (R. 415.) Dr. Handal advised that R.L.B. continue taking his prescribed medications and, as treatment for his mood disorder, increased R.L.B.'s prescription of Abilify and referred him to Spectracare for therapy targeting family stressors. (R. 415.)

On September 26, 2006, R.L.B., along with his mother and sister, returned to Dr. Handal's office. (R. 417.) The mother reported that R.L.B. had stopped taking his medication, that he was "just angry," that he "doesn't want to do anything but lay in the bed and watch TV," and that " he doesn't want to do his work." (*Id.*) R.L.B., however, stated that he did not need medicine and that he does not have an anger problem. (*Id.*) Dr. Handal continued to diagnose R.L.B. as suffering from several psychological conditions, including

ADHD, a mood disorder, NOS, and obsessive compulsive disorder. (*Id.*) He also recommended that R.L.B. continue taking his medications as prescribed. (*Id.*) On November 2, 2006, R.L.B. and his mother returned for an evaluation. The mother reported that R.L.B. was "doing OK on his medications [and] he has been taking them." (R. 419.) Dr. Handal renewed R.L.B's prescriptions. (*Id.*)   Thus, the medical records demonstrate that R.L.B. was repeatedly diagnosed as suffering from obsessive compulsive disorder and routinely prescribed medication to treat this psychological condition. Given the quantum of evidence indicating that R.L.B. has received treatment for his obsessive compulsive disorder on a routine basis since his initial diagnosis in June 2005, the ALJ's failure to consider the mother's testimony, and the lack of specific analysis about the disorder, this court cannot conclude that the Commissioner's failure to consider R.L.B.'s obsessive compulsive disorder as a severe impairment is harmless error.

Moreover, the court cannot conclude that the ALJ's finding that R.L.B.'s obsessive compulsive disorder did not meet the twelve-month durational limitation is supported by substantial evidence.  As previously discussed, the record indicates that R.L.B. was prescribed medication and received therapy and other treatment for his obsessive compulsive disorder on a regular basis between June 2005 and November 2006. In addition, the medical records indicate that R.L.B.'s mother repeatedly informed medical personnel that her son's obsessive compulsive disorder was worsening. When determining at Step Three of the sequential analysis that "there is not, throughout the record, any 12 months period of time

during which the record suggested marked, or greater, impairment of functioning," the ALJ completely ignored the mother's reports in the medical records indicating that R.L.B's obsessive compulsive condition had either only improved somewhat or worsened during treatment. The medical records demonstrate that Dr. Handal and Dr. Rodriguez based their medical opinion in part on the mother's consistent reports that R.L.B. had exhibited signs and symptoms of obsessive compulsive disorder. Thus, when determining that R.L.B.'s obsessive compulsive disorder did not cause marked impairments of functioning over a twelve month period, the ALJ substituted his judgment for that of the medical specialists. This he cannot do. *See Freeman v. Schweiker*, 681 F.2d 727, 731 (11th Cir. 1982). The ALJ is not free to simply ignore medical evidence, nor may the Commissioner pick and choose between the records selecting those portions which support his ultimate conclusion. Therefore, this court cannot conclude that the ALJ's rejection of R.L.B.'s obsessive compulsive disorder as a severe impairment suggesting marked impairments over a twelve-month period is supported by substantial evidence.

### B.  The Discounting of Dr. Handal's Opinion

The plaintiff asserts that the ALJ improperly discounted Dr. Handal's opinion that R.L.B. has marked limitations in attending and completing tasks and interacting and relating with others. The law is well-settled; the opinion of a claimant's treating physician must be accorded substantial weight unless good cause exists for not doing so. *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986); *Broughton v. Heckler*, 776 F.2d 960, 961 (11th Cir. 1985).

However, the weight afforded to a physician's conclusory statements depends upon the extent to which they are supported by clinical or laboratory findings and are consistent with other evidence of the claimant's impairment. *Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986). The ALJ "may reject the opinion of any physician when the evidence supports a contrary conclusion." *Bloodsworth v. Heckler*, 703 F.2d 1233, 1240 (11th Cir. 1983). The ALJ must articulate the weight given to a treating physician's opinion and must articulate any reasons for discounting the opinion. *Schnorr v. Bowen*, 816 F.2d 578, 581 (11th Cir. 1987).

### 1. Attending and Completing Tasks

When discounting Dr. Handal's opinion that R.L.B. has marked limitations in the domain of attending and completing tasks, the ALJ found as follows:

> This domain considers how well the child focuses and maintains attention, begins, carries through, and finishes activities (including the pace activities are performed); and the ease with which the child changes activities.
>
> In this domain, the child has less than "marked" limitations. Dr. Handal indicated the child had marked limitations in this domain, but his specific treatment notes show that the child responds to appropriate treatment and the specific office notes from Dr. Handal do not describe marked, or greater, limitations. The reports from his teachers, and his grades, are convincing to the Administrative Law Judge that the child had less than marked limitations in this domain.

(R. 20-21.)

First, the ALJ's finding completely ignores reports from R.L.B.'s mother during psychological check-ups indicating that R.L.B. has marked limitations in attending and

13

completing tasks. The medical records demonstrate that the plaintiff's mother repeatedly reported to Dr. Handal that R.L.B. had difficulty completing, focusing, and concentrating on tasks. For example, on June 20, 2005, the mother reported to Dr. Handal that R.L.B. "is still having trouble with concentration" and that "he has a hard time with spoken instructions." (R. 299.) The mother also completed an initial evaluation form, in which she indicated that R.L.B. often has difficulty sustaining attention in tasks or play activities and "often does not follow through on instructions and fails to finish schoolwork, chores, or duties . . . (not due to oppositional behavior or failure to understand instructions) for at least six months." (R. 308-09.) During visits to Dr. Handal's office on August 24, 2005, September 23, 2005, and November 8, 2005, the mother reported that R.L.B. was "doing better"; however, she also reported on each occasion that his OCD symptoms were interfering with his functioning "a lot." (R. 282, 287.) During the August 2005 visit, the mother specifically reported that "at school he goes over and over his work," that "he gets stuck on ideas," and that "he can't move forward if he does not know the answer to a problem he just gets stuck there instead of skipping it [and] then coming back to it." (R. 289.) The medical records indicate that Dr. Handal relied in part on the mother's reports of R.L.B.'s behavior when diagnosing and treating R.L.B. for his psychological conditions. Because the ALJ ignored the mother's reports to Dr. Handal, the court is unable to determine whether the ALJ's discounting of Dr. Handal's opinion that R.L.B. has marked limitations in attending and completing tasks is supported by substantial evidence.

The ALJ also ignored the mother's testimony during the hearing concerning R.L.B.'s limitations and gave no reasons for assigning it no weight. The Commissioner argues that, to the extent the ALJ did not discuss the mother's testimony, "this is a demand for form over function." (Doc. No. 19, p. 10.) The court disagrees. Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. *Foote v. Chater*, 67 F.3d 1553, 1561-62 (11th Cir. 1995); *Jones v. Dept. of Health & Human Servs.*, 941 D.2d 1529, 1532 (11th Cir. 1991)(articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowen*, 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).

A lack of sufficiently explicit credibility findings becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "'the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding.'" *Foote v. Chater*, 67 F.3d at 1562, *quoting Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir 1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

In this case, the ALJ failed to conduct a credibility determination. During the hearing,

the mother testified that, "if [she] give[s] [R.L.B.] three chores to do like dishes or clean his room or pick up the yard, he'll remember to do the first one but if [she] tells him in the middle of while he's doing something he'll stop doing that and go do something else " and that he switches activities before completion.  (R. 441-42.)  She also stated that, "when he's doing his work he can't move on because . . . if he's stuck on a problem, it's hard for him to move on and come back to that."  (R. 445.)  "Lay witnesses who know a claimant well may provide an important source of evidence to demonstrate the claimant's disability."  *Brown v. Shalala*, 44 F.3d 931, 936 (11th Cir. 1995); *Jones v. Astrue*, 494 F. Supp. 2d 1284, 1289 (N.D. Ala. 2007).  Because the ALJ did not discuss the mother's credibility and ignored her testimony concerning R.L.B.'s behavior in his analysis, the court is unable to determine whether the ALJ's determination is supported by substantial evidence.

  This court likewise cannot conclude that the ALJ's determination that teachers' reports indicate that R.L.B. has less than marked limitations in attending and completing tasks is supported by substantial evidence.  A teacher questionnaire completed by Ms. Brenda Cofu indicates that R.L.B. had a D average in Reading, English, and Social Studies.  (R. 93.)  In addition, Ms. Cofu indicated that, in the domain of attending and completing tasks, R.L.B. had "serious problems" with (1) focusing long enough to finish assigned activity or task, (2) refocusing to task when necessary, and (3) completing work accurately without careless mistakes.  (R. 96.)  She also indicated that R.L.B. had "very serious problems" with (1) organizing his own things or school materials, (2) completing class/homework assignments,

and (3) working at a reasonable pace/finishing on time. (R. 96.) The ALJ ignored Ms. Cofu's assessment when determining that R.L.B. has less than marked impairments in attending and completing tasks. Thus, this court cannot conclude that the A.L.J.'s determination that R.L.B.'s school records "show . . . that [R.L.B.] does not exhibit, in a classroom or school setting, marked impairment of functioning in any applicable domain"[5] is supported by substantial evidence.

### 2. The Ability to Interact and Relate with Others

When discussing R.L.B.'s ability to interact and relate with others, the ALJ found as follows:

> The issue in this domain is how well the child initiates and sustains emotional connections with others, develops and uses community's language, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others.
>
> In this domain, the child has no limitations. Dr. Handal indicated that the child had a marked limitation in this domain. However, his teachers both indicated no limitations and nothing in the record supports any restrictions in this area. The child's teachers, who observed him [in] an educational setting that required interacting with other children and adults, [were] in a much better position to assess this domain. Even though Dr. Handal's opinion was made at a later time, there is absolutely nothing in the record that suggests any deterioration of the child in this domain.

---

[5] (R. 19.)

(R. 21.)

This court cannot conclude that the ALJ's determination that "there is **absolutely nothing** in the record that suggests any deterioration" of R.L.B.'s ability to interact and relate with others is supported by substantial evidence. During the hearing, R.L.B.'s mother testified that R.L.B. has a "bad temper" and that he will "take [things] the wrong way." (R. 437.) She also stated that R.L.B. had been in three fights over the past year and that he got into a couple of fights in seventh and eighth grade. (R. 439.) In addition, school records indicate that R.L.B. was suspended for fighting in May 2008. (R. 379.) Medical records also indicate that the mother reported that R.L.B. had difficulties relating to others. For example, in June 2005, the mother reported that R.L.B. "has poor conduct" and "has a hard time bossing his friends and expecting others to do what he tells them." (R. 299.) She also indicated that R.L.B. had gotten into several fights at school over the past few years. (*Id*.) In October 2005, the mother reported that R.L.B. "has to have things his way or no way [and] he will not compromise." (R. 284.) She also reported that he "punched a hole in the wall because his sister woke him up" and that "he is worse because of his smart mouth and attitude." (R. 284.) In August 2006, R.L.B.'s mother reported that R.L.B. "acts like he is not supposed to get punished and he still punches walls." (R. 415.) Because the school records and the mother's testimony and her reports to the examining psychologist, which were not properly discredited by the ALJ, indicate that R.L.B. has limitations in interacting and relating with others, this court cannot conclude that the ALJ's determination that

18

"absolutely nothing in the record . . . suggests any deterioration of the child in this domain" is supported by substantial evidence. Therefore, this court cannot conclude that the ALJ's discounting of Dr. Handal's determination that R.L.B. has marked limitations in the domain of interacting and relating with others is supported by substantial evidence.[6]

## IV. Conclusion

Accordingly, this case will be reversed and remanded to the Commissioner for further proceedings consistent with this opinion.

A separate final order will be entered.

Done this 18th day of December, 2008.

                         /s/Charles S. Coody
                         CHARLES S. COODY
                         UNITED STATES MAGISTRATE JUDGE

---

[6] In his analysis, the ALJ found that R.L.B. was treated for his mental conditions on a "sporadic basis." The problem with this finding is that the medical records indicate that R.L.B. was routinely treated by healthcare personnel for a variety of psychological conditions during the relevant time period. The court recognizes that Dr. Handal stated in his own notes that he treated R.L.B. "sporadically since 6/05 [and] before that sporadically since 10/03." (R. 275.) The record, however, indicates that R.L.B. met with Dr. Handal for counseling and treatment on a monthly basis from June 2005 through March 2006, as well as in August and September 2006. Although Dr. Handal treated R.L.B. on a few occasions in 2003, the record indicates that R.L.B. also received treatment from his pediatrician for ADHD in 2003 and 2004. The court also notes that Dr. Handal referred R.L.B. to Dr. Rodriguez for counseling in 2005, and that R.L.B. was examined by this child psychologist on at least three occasions. On remand, the ALJ should resolve this inconsistency in the record.